UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FERIAL S. POLHILL, et al.  )
  )
  Plaintiffs,  )
  )
  v.  )  Civil Action No. 00-1798 (TPJ)
  )
THE ISLAMIC REPUBLIC OF IRAN,  )
et al.,  )
  )
  Defendants.  )

**FILED**

AUG 2 3 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## DECISION AND ORDER

Plaintiff Ferial Polhill, individually and as administratrix of the estate of the late Robert Polhill, together with her stepsons Brian and Stephen Polhill, bring this action against the Islamic Republic of Iran ("Iran") and its Ministry of Information and Security ("MOIS") pursuant to the Foreign Sovereign Immunities Act ("FSIA") for damages resulting from the 39-month captivity of Robert Polhill in Lebanon. Jurisdiction is predicated upon 28 U.S.C. §§1330(b) and 1605(a)(7).

The action has proceeded by default, and the Court held an evidentiary hearing on August 13-14, 2001, from which the facts set forth below are found pursuant to Fed. R. Civ. P. 52(a).[1]

---

[1] The defendants were properly served with process pursuant to 28 U.S.C. §1608(a)(4), but failed to answer or otherwise respond to the complaint. The Court granted plaintiffs' motion for entry of default on April 10, 2001. 28 U.S.C. §1608(e) provides that "[n]o judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." The



#17

**I.**

Robert Polhill was a United States citizen born in Beacon, New York on June 3, 1934. He was trained as a public accountant, working first for Arthur Anderson & Co. and then Touche Ross & Co. in New York. Polhill and his first wife had two sons, Stephen, born in 1963, and Brian, born in 1967. Although Polhill and his first wife divorced in 1976, he continued to see his sons regularly and played a significant role in their lives throughout their teenage years. In October, 1978, while working in New York for Touche Ross, Robert Polhill was sent to Cyprus on business, where he met Ferial, his wife-to-be, who worked for a Touche Ross affiliate, Saba and Company. Robert and Ferial married in Beirut, Lebanon on May 3, 1980 and lived in New York for the next three years.

In 1983, Robert was offered a teaching position at Beirut University College ("BUC"), which he accepted. The Polhills moved to Beirut, and Robert began teaching accounting and business at BUC. Polhill enjoyed teaching and was dedicated to his students. He and Ferial traveled extensively, but they also enjoyed living in Beirut, a city in which Ferial had lived most of her adult life and where members of her family also lived.

Starting in 1984, the political situation in Beirut became increasingly perilous, particularly for Americans. The president of the American University of Beirut was assassinated and several of its professors, including Thomas Sutherland and Joseph Cicippio, were kidnapped. Safety became an increasing concern on the campus of BUC as well. In early 1987, Ferial pleaded with Polhill to leave Beirut, and he agreed that they would leave at the end of the term

---

evidentiary hearing was held to establish plaintiffs' right to a default judgment.

after his students' final examinations; he would grade the exams in Cyprus, he said, but never did.

On January 24, 1987, the Polhills received a phone call purporting to be from the BUC administration notifying them of a meeting of all foreign professors to discuss safety precautions on campus in light of the kidnappings of westerners in Lebanon. Robert and Ferial attended that meeting, along with three other American professors at BUC: Alann Steen, Jesse Turner, and Mithileshwar Singh (an American resident, but an Indian citizen), and Mrs. Virginia Steen, the wife of Alann Steen. Present in the room were a number of Lebanese "policemen" who proposed to demonstrate how to avoid being kidnapped. Once the foreigners were assembled, the "police" stood the four men up and led them from the room at gunpoint. Ferial remembers her feeling of panic and her husband's response as the "police" handcuffed the men: "Don't worry sweetheart, this is only a drill." Ferial did not see her husband for the next 1,185 days. The "police" were kidnappers who had orchestrated the ruse to seize the foreign professors.

The kidnappers forced the four handcuffed men into a waiting van and drove them to a house in Beirut where they were herded into an upstairs room, thrown about, and beaten by their captors. The four were held in this house for several hours and then transported to other locations in subsequent days. Meals were erratic and minimal. The captives were outfitted in only t-shirts and pajamas or sweat suits. In the early months of their captivity, the hostages were chained together at the legs in groups of two. Thereafter, each had one arm or leg shackled to a wall, freed only for three daily bathroom breaks and occasional showers. At some locations, Polhill's chain was so short that he was unable to stand up. After Prof. Singh was released in October, 1988, the remaining three hostages were transported to a "villa" where they were

confined for 16 months. The conditions in the "villa" were yet more deplorable: the hostages were allowed to shower only a few times per year and given a change of clothes only when the clothes were literally rotting from their bodies. The villa was dark and cold and the hostages' diet was meager. Polhill lost a considerable amount of weight during his captivity and was quite frail upon his release. All the while, he suffered from a chronic throat irritation and coughing, and he contracted colds that affected him more severely than his fellow hostages.

Polhill was also a diabetic and needed regular insulin injections to control the disease. Upon realizing that her husband had been kidnapped, Ferial placed advertisements in local newspapers proclaiming that Polhill needed insulin in the hope that his captors would see the ads. Apparently they did; the captors began to provide Polhill with insulin, albeit on an irregular basis. Polhill would inject himself with the insulin; however, he had to estimate the proper amount without knowing his blood sugar level or the exact amount of insulin he was dispensing. Sometimes he was not given food to help moderate his blood sugar, causing him to suffer insulin shock. One day in the winter of 1987, Polhill awoke in a cold sweat, then became nearly comatose until his fellow hostages were able to convince the guards to provide some sweetened cola that they forced down Polhill's throat, likely saving his life.

During their captivity, despite the inhuman conditions and poor lighting, the hostages tried to keep themselves busy and their minds active by playing cards (somewhat slowly because of the chains) and reading (and re-reading) anything provided to them. Robert kept a diary until his captors found and confiscated it. He also created London Times-style crossword puzzles to alleviate the boredom. Notwithstanding their attempts to focus their minds elsewhere, the hostages remained in constant fear of death, with the guards an ever-present reminder that their

lives were subject to their captors' whim.

With no advance warning, Polhill was removed from his place of confinement on April 20, 1990 and released two days later. His fellow captives did not know for certain if he had been released or killed until they were later shown a newspaper article indicating that Polhill had been released. He had been held hostage for 1,185 days.

## II.

Ferial, Stephen, and Brian Polhill each testified about the impact of Robert's kidnapping and captivity upon their own lives and the emotional trauma that they suffered with each release of a photograph or information, true or false, about the hostages. Stephen and Brian were both living in the United States when their father was kidnapped, and each learned of the kidnapping from a special news report that interrupted network television coverage of basketball. On January 29, 1987, the captors released a photograph of Polhill with two machine guns pointed at his head, accompanied by a threat to kill him unless Israel released 400 Palestinian prisoners. Ferial, Stephen, and Brian all saw this photograph, which was published widely in the news media (including the cover of the February 9, 1987 issue of U.S. News and World Report), and they were terrified for Robert's life. Other photographs and news fragments were disseminated through the press at various points during Polhill's captivity, causing either renewed fear or false hopes of his imminent release. All three family members testified about the emotional difficulties of coping with the precarious uncertainty of his future and apprehension as to whether they would ever see him again.

Throughout Polhill's captivity, Ferial worked to keep his abduction in the public consciousness. She remained in Lebanon, believing that her work would be more effective if she

stayed. (Her efforts apparently did result in procuring insulin he needed to survive in captivity.) She attended a meeting with the spiritual leader of the Lebanese terrorist organization Hezbollah, in an unsuccessful attempt to secure Robert's release. She also persuaded BUC to continue to pay Polhill's salary and his subsidy so that she could still support his sons in the U.S.

Finally, on April 22, 1990, one release rumor proved true: Robert was freed. His family was overjoyed at the end of this long ordeal. Ferial met her husband at the home of the American Ambassador in Damascus, Syria, and the two then flew to the United States' medical center in Wiesbaden, Germany, where Stephen and Brian joined them. Although Polhill was frail and malnourished, the reunion was an emotional high point for the family. Their joy at Robert's release and return to the U.S. was soon dampened by sobering news: during his captivity, Robert had developed cancer of the larynx. The cancer was quite advanced, requiring a total laryngectomy followed by radiation treatment. Polhill remained in Walter Reed Army Medical Center for nine months to recuperate; then, upon his discharge, he was unable to find employment in large part because his speech was severely impaired. Eventually, he underwent a successful surgery that largely restored his voice, and was able to make speeches both about his hostage experience and as a spokesman for the American Diabetes Association. His only regular source of income, however, came from his Social Security disability payments, so family finances were tight.

In 1998, Polhill was again diagnosed with cancer, this time in the bladder, and he died on July 1, 1999 at Georgetown Hospital.

## III.

The Court heard expert testimony from Dr. Patrick Clawson of The Washington Institute for Near East Policy and from former U.S. Ambassador Robert Oakley regarding Iran's sponsorship of terrorism in the Middle East and in particular in relation to Mr. Polhill's kidnapping and captivity. "Hezbollah"–the "Party of God" in Arabic–was established in Lebanon with Iranian sponsorship between 1983 and 1985. A number of groups operate under its umbrella, all with the common goal of driving Western influence from Lebanon. Although many names are used by these groups, they are all constituent parts of Hezbollah. The expert testimony and United States government documents admitted in evidence make clear that Iran has supported Hezbollah since at least the early 1980s.[2]

The expert testimony also established that Hezbollah was directly responsible for Polhill's abduction and captivity, and that Iran and MOIS played a significant role as well. Distinctive characteristics of the hostage-taking operation indicating Iranian support include the degree of "professionalism" with which the kidnapping was carried out and the ability of the kidnappers to hold the hostages, undetected, for such a long period of time in relative proximity

---

[2] Iran's connections to the Shi'a community in southern Lebanon date to the 17th century. Following the Israeli invasion of Lebanon in 1982, Iran sought to take advantage of the discontent and anti-Western, anti-Israeli sentiment among Lebanese Shi'as. Iran saw the 1982 Israeli invasion as an opportunity for Iran to play a greater role in Muslim politics and establish itself as the leader of the anti-Western cause. In furtherance of these goals, Iran provided direct leadership and financial and material support to Hezbollah, including weaponry and "military" training, such as teaching interrogation techniques and methods for hiding hostages. Iran's annual financial support for Hezbollah has fluctuated between approximately $50 million and $100 million. Iran's Ministry of Information and Security is the principal agency of the Iranian government responsible for supporting terrorism abroad, as well as the suppressing internal dissent. MOIS is an official government ministry employing between 20,000 and 30,000 people.

to Beirut. Additionally, Iran was intimately involved in negotiating with a United Nations representative to secure Polhill's release, clearly permitting the inference that the hostage-takers were subordinate to, and acting at the behest of, the Iranian government. Documents admitted into evidence and testified to by Ambassador Oakley also detailed Iran's involvement in providing funding, policy guidance, training, and military equipment to Hezbollah and supporting Hezbollah's terrorist and hostage-taking activities in Lebanon. The United States government's annual "Patterns of Global Terrorism" publication indicates that Hezbollah orchestrated the kidnapping and captivity of the Americans held hostage in Lebanon, which included Mr. Polhill.

## IV.

It is well-established that a foreign sovereign is immune from the jurisdiction of United States courts unless one of the enumerated exceptions to the Foreign Sovereign Immunities Act, 28 U.S.C. §§1601-1611, applies. See 28 U.S.C.§1604. The FSIA explicitly provides a cause of action for:

> personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment or agency.

28 U.S.C. §1605(a)(7). Thus, the FSIA authorizes personal injury claims against a foreign state that provides material support or resources for acts of hostage taking. The evidence presented to the Court has established that Mr. Polhill suffered personal injuries as a result of his being taken hostage in Lebanon in 1987. The evidence has also established that Iran and MOIS provided material support for Hezbollah and its terrorist activities in Lebanon, which included the

-8-

kidnapping and 1,185-day imprisonment of Mr. Polhill. Iran was designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 on January 23, 1984, and has remained so designated ever since; thus the requirements of 28 U.S.C. §1605(a)(7)(A) are met. The victim, Robert Polhill, was a United States citizen at the time of his kidnapping and captivity. See 28 U.S.C. §1605(a)(7)(B). Thus, as in other cases brought against Iran under this exception to the FSIA, this Court has subject matter jurisdiction over the case.[3] See, e.g., Flatow v. Islamic Republic of Iran, 999 F.Supp. 18 (D.D.C. 1998); Cicippio v. Islamic Republic of Iran, 18 F.Supp. 2d 62 (D.D.C. 1998); Anderson v. Islamic Republic of Iran, 90 F.Supp.2d 107 (D.D.C. 2000); Higgins v. Islamic Republic of Iran, C.A. 99-377-CKK (D.D.C. Sept.21, 2000). This Court also has personal jurisdiction over the defendants.[4]

## VI.

Plaintiff Ferial Polhill, as administratrix of the estate of Robert Polhill, seeks compensatory damages for battery, assault, false imprisonment, economic damages, intentional infliction of emotional distress, and loss of consortium. Each of these causes of action is authorized by 28 U.S.C. §1605(a)(7). Although no amount of money can fully compensate plaintiffs for Robert Polhill's ordeal in captivity, this Court and other judges of this district have

---

[3] The case is timely because the ten-year statute of limitations was tolled for the period during which Iran was immune from suit. See 28 U.S.C. §1605(f).

[4] The statutory requirements for personal jurisdiction are satisfied: service was proper and the Court has subject matter jurisdiction under the FSIA. See 28 U.S.C. §1330(b). Although it is unsettled in this Circuit whether a foreign state is also entitled to due process protections, see Creighton Ltd. v. Government of Qatar, 181 F.3d 118, 124 (D.C. Cir. 1999), other judges in this district court have found that subject matter jurisdiction under 28 U.S.C. §1605(a)(7) plus service of process satisfies the constitutional due process requirements as well. See, e.g., Daliberti v. Republic of Iraq, 97 F.Supp.2d 38, 52-54 (D.D.C. 2000).

established a calculus to compensate for the captivity of the Americans held hostage in Lebanon under the conditions endured by Polhill. See, e.g., Anderson, 90 F.Supp.2d at 113. The Court observes that the impact of Polhill's captivity extended far beyond the 1,185 days during which he was held hostage. Shortly after his release, Polhill and his family learned that he had advanced cancer of the larynx that would ultimately require a total laryngectomy. That operation removed his voice box and rendered him mute for some time. His loss of speech, as well as an extensive period of convalescence, virtually curtailed Polhill's ability to work, and expert testimony established that Polhill's lost income and wages totaled approximately $813,000. The absence of medical attention during Polhill's captivity prevented early diagnosis and treatment of the malignancy, and rendered him hostage to the disease almost immediately upon his "release" from physical confinement. The Court finds that an enhancement of the established calculus for compensatory damages is appropriate and awards damages of $15,000,000 to the estate of Robert Polhill.

Plaintiff Ferial Polhill seeks compensatory damages based on causes of action of intentional infliction of emotional distress, and loss of consortium and solatium. Mrs. Polhill is a naturalized U.S. citizen. Plaintiffs Stephen and Brian Polhill each seek compensatory damages for loss of solatium. Employing essentially the same calculus as in Cicippio and Anderson, the Court will award compensatory damages to Ferial Polhill in the amount of $10,000,000 and to Stephen and Brian Polhill in the amount of $3,250,000 each.

The plaintiffs also pray for an award of punitive damages against MOIS.[5] Plaintiffs have

---

[5] Although the FSIA exempts a foreign state from liability for punitive damages, an "agency or instrumentality" of the foreign state, such as MOIS, is vulnerable to a punitive

demonstrated MOIS's intimate involvement in sponsoring terrorist activities in Lebanon, including the abduction and detention of Robert Polhill. The details of his 39-month imprisonment during which he was shackled in cold, dark rooms without proper care for his health are horrific. MOIS's tortious conduct certainly merits an award of punitive damages both to punish the wrongful conduct and to prevent its repetition. As in Anderson, this Court concludes, on the basis of Dr. Clawson's testimony, that an award of thrice the amount of MOIS's maximum annual budget for terrorist activities, or $300 million, is the closest approximation it can make to an appropriate award.

It is therefore, this 22nd day of August, 2001,

ORDERED, that judgment be entered in favor of the plaintiffs against the Islamic Republic of Iran and its Ministry of Information and Security, jointly and severally, for compensatory damages as follows:

| | |
|---|---|
| Estate of Robert Polhill: | $15,000,000 |
| Ferial Polhill: | $10,000,000 |
| Stephen Polhill: | $3,250,000 |
| Brian Polhill: | $3,250,000 |

IT IS FURTHER ORDERED, that judgment be entered in favor of plaintiffs, jointly and severally, against the defendant Iranian Ministry of Information and Security for punitive damages in the amount of $300,000,000; and it is

FURTHER ORDERED, that the Clerk of Court forthwith enter judgments in accordance

---

damage award. See, e.g., Anderson, 90 F.Supp.2d at 114.

with the foregoing; and it is

FURTHER ORDERED, that plaintiffs may arrange for this decision and order to be translated into Farsi and, at plaintiff's request, the Clerk's Office shall cause a copy of the translated decision and order to be transmitted to the U.S. Department of State for service upon defendants through diplomatic channels.

Thomas Penfield Jackson
U.S. District Judge